# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**BRAY SHEET METAL COMPANY;**
**EDWARDS METALS, INC.;**
**KETCHER & COMPANY, INC.; and**
**HSI, INC. D/B/A HARVEY SHEET METAL, INC.**                    **PLAINTIFFS**

**v.**                    **Case No. 4:20-cv-00695-KGB**

**INTERNATIONAL ASSOCIATION**
**OF SHEET METAL, AIR, RAIL AND**
**TRANSPORTATION WORKERS (SMART)**
**LOCAL UNION NO. 36-L, AFL-CIO**                    **DEFENDANT**

## OPINION AND ORDER

This case involves a dispute between sheet metal contractors and a sheet metal employees' union regarding a 2017 interest arbitration award which imposed on the parties a collective bargaining agreement and included an interest arbitration clause. Before the Court is a motion for summary judgment filed by plaintiffs Bray Sheet Metal Company ("Bray"), Edwards Metals, Inc. ("Edwards"), Ketcher & Company, Inc. ("Ketcher"), and HSI, Inc. d/b/a Harvey Sheet Metal, Inc. ("Harvey") (Dkt. No. 21). Also before the Court is a motion for summary judgment filed by defendant International Association of Sheet Metal, Air, Rail and Transportation Workers Local Union No. 36-L, AFL-CIO ("Union") (Dkt. No. 27). The parties filed responses and replies to the respective motions (Dkt. Nos. 28, 32, 34, 37). Plaintiffs filed a motion for leave to file sur-reply to defendants' motion for summary judgment and attached their proposed sur-reply (Dkt. No. 39). The Court grants plaintiffs' motion, has considered plaintiffs' proposed sur-reply when ruling on the pending motions, and directs plaintiffs to file their proposed sur-reply within 10 days from the entry of this Order (Dkt. No. 39). For the following reasons, the Court grants plaintiffs' motion for summary judgment and denies defendants' motion for summary judgment (Dkt. Nos. 21, 27).

## I. Background

The Union is a labor organization which represents employees in the sheet metal trade (Dkt. No. 12, at 3). Plaintiffs are sheet metal contractors in Arkansas (Dkt. No. 13, ¶ 1). Plaintiffs were members of a multiemployer bargaining group ("Group") which entered into a collective bargaining agreement with the Union effective June 1, 2015 (Dkt. No. 23, ¶ 1). Article XVI, Section 5 of the 2015 agreement provided for the delegation of bargaining authority from the individual contractors to the Group and for the timely termination of that authority by an individual contractor (Dkt. No. 31, ¶ 1). No individual contractor provided the 150-day notice required by Article XVI, Section 5 to terminate the authority of the Group to engage in bargaining for a successor agreement in 2017 (*Id.*, ¶ 2). The 2015 agreement also contained an interest arbitration clause at Article X, Section 8 (Dkt. No. 29-2, at 18–19).

Around April 2017, the Union and the Group began bargaining for a successor contract (Dkt. No. 23, ¶ 2). The Union and the Group met on April 11, 2017; May 5, 2017; and June 6, 2017 (Dkt. No. 31, ¶ 3). The Union contends that 13 Arkansas contractors delegated their bargaining rights to the Group during the 2017 negotiations, but plaintiffs dispute that the Group included 13 active contractors (Dkt. Nos. 31, ¶ 2; 33, ¶ 2). Representatives of the Group at these negotiation meetings included Bray, Edwards, and Harvey, as well as Little Rock Sheet Metal Co. ("Little Rock Sheet Metal"), and Campbell Sheet Metal, Inc. ("Campbell Sheet Metal") (Dkt. Nos. 23, ¶ 3; 31, ¶ 3). Ray Reasons, Steve Roofener, and David Zimmermann attended these meetings on behalf of the Union (Dkt. Nos. 29, ¶ 2; 29-3, at 1).

The meeting on April 11, 2017, dealt with a proposed increase to the wage and benefit package, the jointly administered health and welfare fund, the jointly administered National Pension Fund, journeymen accepting foremen positions, a discussion about the apprenticeship

program, and general problems about non-union competition (Dkt. No. 31, ¶ 4). The sign-in sheet attached to the Union's notes for the April 11, 2017, meeting appears to include the signatures of Mr. Reasons, Mr. Roofener, and Mr. Zimmermann for the Union; Chris Cozart for Little Rock Sheet Metal; Hilda Booth and Mary Bray Kelley for Bray; Scott Hall for Edwards; Greg Harvey for Harvey; and Larry Campbell and Wayne Campbell for Campbell Sheet Metal (Dkt. Nos. 29-3, at 2; 29-7, at 2).

At the May 5, 2017, meeting, the Union and the Group agreed to retroactivity and discussed that the membership wanted to increase apprentice wages to encourage recruitment of apprentices, the need for increases in the package to cover increases in the employee benefit plans, the breakdown of the Education, Building and Public Relations Fund ("EOPR Fund"), the status of the jointly administered health and welfare fund, and proposed yearly increases to the wage and benefit package of $0.75 per year (Dkt. No. 31, ¶ 5). According to the Union's notes of the meeting, Mr. Zimmermann "asked Mr. Hall and mentioned Woody Simmons to be the ones to review new language in our next agreement and Scott agreed saying he had noticed some wording that need [*sic*] to be changed and or updated." (Dkt. No. 29-4, at 1). The Union's notes further indicate that, with respect to hourly wages, "no decisions were made today as not all contractors were in attendance." (*Id.*, at 1). The sign-in sheet attached to the Union's notes appears to include signatures of Mr. Reasons, Mr. Roofener, and Mr. Zimmermann for the Union; Mr. Cozart for Little Rock Sheet Metal; and Mr. Hall for Edwards (*Id.*, at 3).

At the June 6, 2017, meeting, there was a discussion of the requested increases to the wage and benefit package (Dkt. No. 31, ¶ 6). The parties reached a tentative agreement at this meeting, but the parties dispute the content of the tentative agreement. Plaintiffs argue that the tentative agreement pertained only to wages, and the Union argues that there was a tentative agreement *in*

*toto* (Dkt. No. 23, ¶ 4). At the meeting, Mr. Zimmermann passed out and reviewed non-economic collective bargaining agreement language which had been recommended by the SMART International Union (Dkt. No. 31, ¶ 6). According to the Union's notes of the meeting, "[a]fter completing the review of the new wording changes Dave told the contractors he would get a 'red line copy' to all contractors and at a meeting to be determined again review with the contractors for their approval." (Dkt. No. 29-5, at 1). The Union's notes further indicate that the contractors made an offer to increase wages by an average of $0.50 for three years (*Id.*). According to the Union's notes, Mr. Zimmermann "thanked the contractors for their efforts and told them that he would check his schedule to set up next meeting with the membership to approve this offer." (*Id.*). The sign-in sheet attached to the Union's notes appears to include signatures of Mr. Reasons, Mr. Roofener, and Mr. Zimmermann for the Union; Mr. Cozart for Little Rock Sheet Metal; Ms. Kelley for Bray; Mr. Hall for Edwards; Greg Harvey for Harvey; Larry Campbell for Campbell Sheet Metal; and one other individual (Dkt. No. 29-5, at 2).

On June 8, 2017, Sherry Bahr sent an email and attachment on behalf of Mr. Zimmermann to email addresses which appear to be associated with Little Rock Sheet Metal, Ms. Kelley, and Larry Campbell, copied to Mr. Zimmermann and Mr. Roofener, and with a subject line reading "STANDARD FORM OF UNION AGREEMENT AND ADDENDUM - DRAFT #2 Attached for your review" (Dkt. No. 4-1). The email read:

> All, Please take time to review the attached Draft #2 and respond to me by Friday, June 16 at 12:00pm Noon so we may then schedule a meeting for Members to review/vote on the contract. If I do not hear from you by Noon on June 16, I will assume you are in agreement with Draft #2 as it is written.
>
> Thank you,
>
> Dave

**Steve Roofener**: please forward to Scott Hall with Edwards Metals Inc. and Greg Harvey with Harvey Sheet Metal Inc., as we do not have their email addresses on file. *Please CC this office so we will then have their email addresses.*

(*Id.* (emphases in original)). Ms. Bahr in a signed letter indicated that she never received the carbon copy from Mr. Roofener, so she does not know if he forwarded the email as requested (Dkt. No. 4-2, at 1). On July 7, 2017, the Union's membership voted against whatever tentative agreement existed on June 6, 2017 (Dkt. No. 23, ¶ 5).

On July 20, 2017, attorney Jess Sweere sent a letter to the Union stating that he had been retained to represent Bray, Edwards, and Harvey and that these employers desired to negotiate revisions to the agreement (Dkt. Nos. 31, ¶ 8; 29-6, at 1).

The Union and the Group met again on August 10, 2017 (Dkt. No. 31, ¶ 9). A sign-in sheet attached to the Union's notes of the meeting include the handwritten names of Mr. Reasons and Mr. Zimmermann for the Union; Mr. Cozart for Little Rock Sheet Metal; Ms. Booth, Mr. Simmons, and Ms. Kelley for Bray; Mr. Harvey for Harvey; Mr. Hall for Edwards; Mr. Sweere; and Larry Campbell for Campbell Sheet Metal (Dkt. No. 29-7, at 3). Mr. Sweere submitted a redlined proposed collective bargaining agreement with a title page reading, "The following Arkansas Contractors Proposal was submitted by: J.E. Jesse Sweere, Attorney at Law on behalf of: Bray Sheet Metal Company, Edwards Metal, Inc., Harvey Sheet Metal, Inc." (Dkt. No. 31, ¶ 9; Dkt. No. 29-8, at 1). This proposal eliminated many of the provisions of the 2015 agreement including the hiring hall, the grievance/arbitration procedure, the apprenticeship program, and the interest arbitration clause of Article X, Section 8 (Dkt. No. 31, ¶ 9). Based on record evidence before the Court, this proposal was the first proposal to delete the interest arbitration clause contained in Article X, Section 8 (*Id.*).

According to the Union's notes from the August 10, 2017, meeting, the contractors present caucused for 40 minutes (Dkt. No. 29-7, at 1). Mr. Cozart exited the caucus and told Mr.

Zimmermann that Mr. Sweere was not representing Little Rock Sheet Metal and that Mr. Cozart did not agree with how the three contractors were going about this (*Id.*). Mr. Zimmermann then reentered and asked Mr. Sweere whom he was representing (*Id.*). Mr. Sweere stated that he was speaking for the Group, and Larry Campbell stated that Mr. Sweere was not speaking for him (*Id.*). Mr. Hall in an affidavit clarified that Campbell Sheet Metal did not necessarily oppose Mr. Sweere's efforts, but Little Rock Sheet Metal did oppose them (Dkt. No. 34-1, ¶ 15). Mr. Sweere then said that he was representing three contractors: Bray, Edwards, and Harvey (Dkt. No. 27-1, at 1). Mr. Zimmermann and Mr. Sweere discussed their respective proposals, and Mr. Hall stated that he never received Mr. Zimmermann's proposal by email (*Id.*, at 1–2). Mr. Zimmermann declared deadlock (*Id.*, at 2).

## II.    Procedural History

On August 17, 2017, the Union invoked interest arbitration pursuant to Article X, Section 8 of the 2015 agreement and made a submission to the National Joint Adjustment Board for the Sheet Metal Industry ("NJAB") (Dkt. Nos. 23, ¶ 8; 31, ¶ 12). On August 24, 2017, Bray, Edwards, and Harvey filed a response to the Union's submission to the NJAB in which the employers objected to NJAB jurisdiction and submitted a proposal that did not include interest arbitration (Dkt. Nos. 23, ¶¶ 9–10; 31, ¶ 13).

On September 11, 2017, the NJAB conducted an interest arbitration hearing between the Union and the Group (Dkt. No. 31, ¶ 16). Counsel for Bray, Edwards, and Harvey was present, as was Chris Cozart of Little Rock Sheet Metal (Dkt. Nos. 23, ¶¶ 11–12; 29-13, at 1). Mr. Reasons and Mr. Zimmermann appeared on behalf of the Union (Dkt. No. 29-13, at 1). At the hearing, Bray, Edwards, and Harvey did not consent to the NJAB including Article X, Section 8 in any contract it would award (*Id.*, ¶ 15).

The NJAB directed the parties to execute a successor agreement which included an interest arbitration clause (*Id.*, ¶ 20). The NJAB first concluded that it had jurisdiction and that all procedural requirements had been met (Dkt. No. 29-13, at 2). The NJAB then concluded:

> The parties are directed to execute a three-year agreement with the same terms and conditions as were tentatively agreed to by the Local Union and the multiemployer group on June 6, 2017 as reflected in the minutes of that meeting.
>
> In reaching the above-decision, it is the judgment of this Board that the multiemployer group had no clear spokesperson. With no procedures or past practice as to how to resolve their internal disputes, the employers appeared before this Board with conflicting positions. Having no means to resolve this conflict for the employers, the Board has looked for the most recent point in the negotiations when the multiemployer group held a cohesive position. The record reflects and the parties testified that the last consensus position held by the multiemployer group was the June 6, 2017 tentative agreement with the Local Union, which included Article X, Section 8.
>
> Considering the above, imposition of the June 6, 2017 tentative agreement is appropriate.

(*Id.*, at 2). Neither the Group nor any individual contractor filed a lawsuit to vacate the NJAB decision (Dkt. No. 31, ¶ 17). On September 18, 2017, Mr. Sweere sent an email to Joye Blanscett stating that Bray, Edwards, and Harvey "hereby object to the decision of the NJAB as a whole and disagree with each and every finding in the DECISION," specifically the inclusion of Article X, Section 8 (Dkt. No. 29-14). On June 15, 2018, the Office of the General Counsel of the National Labor Relations Board ("NLRB") issued an Advice Memorandum concluding that the Union had acted lawfully in pursuing interest arbitration in 2017 (Dkt. No. 31, ¶ 22).

On December 23, 2019, plaintiffs timely withdrew from the Group (*Id.*, ¶ 23). Plaintiffs and the Union held three bargaining meetings in May 2020, at the end of which the Union communicated its intention to invoke interest arbitration (Dkt. No. 31, ¶¶ 25–27).

On May 29, 2020, plaintiffs filed their complaint in this Court seeking a declaratory judgment that the interest arbitration clause in the 2017 agreement is void and unenforceable (Dkt.

No. 1). Plaintiffs filed motions for preliminary injunction on June 4, 2020, and June 11, 2020, and an amended complaint on June 19, 2020 (Dkt. Nos. 3, 4, 10, 13). The Union filed motions to dismiss on June 12, 2020, and July 1, 2020 (Dkt. Nos. 11, 15).

On November 9, 2020, this Court denied the Union's motions to dismiss (Dkt. No. 19). As the Court explained in that Order, this Court has subject matter jurisdiction, and the statute of limitations does not bar plaintiffs' claims (*Id.*). On March 30, 2021, the Court denied as moot for reasons explained in its Order plaintiffs' motions for preliminary injunction and to shorten time to respond and amended motion for preliminary injunction (Dkt. No. 40).

The parties filed their cross-motions for summary judgment on December 2, 2020, and January 5, 2021 (Dkt. Nos. 21, 27). The parties' motions are ripe and ready for this Court's review.

### III.    Legal Standard

Summary judgment is proper if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment;

rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.    Analysis

Plaintiffs in their motion for summary judgment argue that the NJAB's imposition through the 2017 interest arbitration of a collective bargaining agreement which includes an interest arbitration clause renders the interest arbitration clause unenforceable as against public policy (Dkt. No. 21, at 2). The Union in its motion for summary judgment argues that the statute of limitations and collateral estoppel bar plaintiffs' claims, that the Group consented to interest arbitration, and that plaintiffs adopted the 2017 agreement through a course of conduct (Dkt. No. 27, at 1–2).

The Court will first address the threshold arguments in the Union's motion for summary judgment that the statute of limitations and collateral estoppel bar plaintiffs' claims. The Court will then address plaintiffs' arguments that the NJAB's decision to impose an interest arbitration clause in the 2017 agreement renders the interest arbitration clause void and unenforceable as

against public policy and the Union's arguments in response that the Group consented to interest arbitration and that plaintiffs adopted the 2017 agreement through a course of conduct.

### A. The Union's Motion For Summary Judgment

#### 1. Statute Of Limitations

As an initial matter, the Union argues that plaintiffs' action is barred by the statute of limitations (Dkt. No. 28, at 10). The Union concedes that plaintiffs have sufficiently preserved their substantive objection to the upcoming arbitration, but the Union argues that the controlling question is whether plaintiffs appropriately challenged the validity of the NJAB award in 2017 (*Id.*). According to the Union, plaintiffs failed to challenge the 2017 NJAB award within 90 days as required by Arkansas Code Annotated § 16-108-223 (*Id.*, at 11–12).

This Court previously concluded that plaintiffs' action is not time-barred, that this specific dispute is properly before the Court, that plaintiffs bring a substantive jurisdictional challenge in the current action, and that plaintiffs provided sufficient notice to the arbitrators of their objections even if they were required to provide such notice (Dkt. No. 19, at 20–24). As the Court explained previously, under controlling Eighth Circuit law, a party may validly challenge an arbitration award by filing an action for declaratory or injunctive relief from the Court prior to commencement of arbitration (*Id.*, at 23).

Further, the Court is not convinced that Arkansas' 90-day statute of limitations for seeking to vacate a final arbitration award applies to this particular case. Plaintiffs have not filed a motion to vacate a final arbitration award, nor do they seek to vacate the arbitration award in their operative amended complaint (Dkt. No. 13). Rather, plaintiffs seek a declaratory judgment that the Union is in violation of the 2017 agreement by attempting to invoke interest arbitration and that the interest arbitration clause in the 2017 agreement is void and unenforceable as against public policy

(*Id.*, ¶ 72). Federal courts "have an absolute duty to determine whether an [arbitration] award violates public policy before enforcing it." *Air Line Pilots Ass'n Int'l v. Trans States Airlines, LLC*, 638 F.3d 572, 578 (8th Cir. 2011). Having examined the record evidence before it and having considered the parties' arguments, the Court is not persuaded to alter its prior ruling on this issue. Accordingly, the Court concludes that plaintiffs' action is not time-barred.

### 2.    Collateral Estoppel

The Union further argues that plaintiffs seek to relitigate whether in 2017 plaintiffs had the authority to speak for the Group and whether the Group had consented to a tentative agreement that included interest arbitration (Dkt. No. 28, at 16). According to the Union, the NJAB decided that plaintiffs did not have authority to speak for the Group and that the Group consented to inclusion of an interest arbitration clause in the successor agreement. Plaintiffs respond that collateral estoppel does not apply to an arbitrator's decision that is void *ab initio* as against public policy, that the NJAB did not make such findings in its decision as the Union attempts to assert here, that the terms of any tentative agreement are not material, and that the relevant issue is whether the parties consented to the arbitrator imposing interest arbitration (Dkt. No. 34, at 8–9).

"Where, as here, a challenge to an arbitration award raises a question of public policy, [courts] do not give a prior award, specifically one which has not been subject to judicial review, any preclusive effect on a matter of public policy." *Trans States Airlines*, 638 F.3d at 579 (citing *W.R. Grace & Co. v. Local 579, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766 (1983)). "Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, 'the question of public policy is ultimately one for resolution by the courts.'" *Iowa Elec. Light & Power Co. v. Local Union 204 of IBEW*, 834 F.2d 1424, 1427 (quoting *W.R. Grace*, 461 U.S. at 766). Accordingly, the Eighth

Circuit has concluded that an arbitrator's unreviewed decision does not preclude an employer's public policy challenge to the arbitration award. *Trans States Airlines*, 638 F.3d at 579. Here, plaintiffs raise a public policy challenge to the NJAB's 2017 arbitration award (Dkt. No. 13, ¶ 72). Plaintiffs' public policy challenge is therefore not precluded by the NJAB's 2017 decision.

Further, the Court is not convinced on the record before it that the NJAB made a finding of fact that the Group consented to inclusion of an interest arbitration clause which would be preclusive of the issue before this Court. The NJAB decided that "the multiemployer group had no clear spokesperson," that "the employers appeared before this Board with conflicting positions," and that "the last consensus position held by the multiemployer group was the June 6, 2017 tentative agreement with the Local Union, which included Article X, Section 8" (Dkt. No. 29-13, at 2). The NJAB therefore concluded that "imposition of the June 6, 2017 tentative agreement is appropriate" (*Id.*). The NJAB did not conclude that the Group consented to interest arbitration in the successor agreement. Thus, even if the NJAB's decision had preclusive effect in this particular case, this Court would not be precluded from evaluating whether the Group consented to interest arbitration in the successor agreement in 2017 because the NJAB made no such finding of fact based on the record before the Court. Indeed, to the extent that the NJAB made any such finding, it found that "the employers appeared before this Board with conflicting positions" (*Id.*).

For these reasons, the Court determines that collateral estoppel does not prohibit plaintiffs from litigating their claims.

### B. Plaintiffs' Motion For Summary Judgment

#### 1. Enforceability Of Interest Arbitration Clause

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), "is premised on the principle that the relationships created by a collective bargaining agreement must be defined by application of 'an evolving federal common law grounded in national labor policy.'" *Oberkramer v. IBEW-NECA Serv. Ctr., Inc.*, 151 F.3d 752, 756 (8th Cir. 1998) (quoting *Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 224–25 (1983)). "[A] court may not enforce a collective bargaining agreement that is contrary to public policy." *W.R. Grace*, 461 U.S. at 766.

In the context of a collective bargaining agreement, an interest arbitration clause provides for arbitration in the event that a deadlock arises during negotiations over a successor agreement. *Sheet Metal Workers' Int'l Ass'n, Local 14 v. Aldrich Air Conditioning, Inc.*, 717 F.2d 456, 456 (8th Cir. 1983). Interest arbitration clauses are generally enforceable. *Id.* at 458. However, "an interest arbitration clause is unenforceable insofar as it applies to the inclusion of a similar clause in a new collective bargaining agreement." *Id.* at 459. Federal courts in the Eighth Circuit and around the country, therefore, will not enforce interest arbitration clauses imposed on the parties as the result of an interest arbitration award without the parties' consent. *See, e.g.*, *IBEW, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.22d 1084, 1089 n.3 (8th Cir. 2004) (recognizing that the court will not enforce interest arbitration clauses imposed *via* interest arbitration "[a]s a protection for employers and employees against the perpetuation of such agreements and the unwanted imposition of multiple generations of successor agreements"); *Aldrich Air Conditioning*, 717 F.2d at 459 (affirming district court judgment that interest arbitration clause was unenforceable as against public policy where union invoked arbitration pursuant to interest arbitration clause and NJAB awarded successor agreement including interest arbitration clause);

*Local 288 IBEW v. CCT Corp.*, No. C972036LRR, 2005 WL 1277784, at *19 (N.D. Iowa May 25, 2005) (holding that union could not use interest arbitration clause included in collective bargaining agreement imposed *via* interest arbitration to impose successor agreement upon employers without employers' consent); *see also Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers*, 817 F.3d 857, 866 (3d Cir. 2016) ("Because second generation interest arbitration provisions imposed without consent violate the contract law principles of the FAA [Federal Arbitration Act] and the public policy goals of the NLRA, we hold that they are unenforceable. . . . Our holding tracks the overwhelming consensus of federal courts."); *Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal Co.*, 786 F.2d 1459, 1461 (11th Cir. 1986) ("Strong national policy favors arbitration of labor disputes. . . . This strong national policy does not, however, allow interest arbitration clauses to be forced into arbitrated contracts more than one time." (citations omitted)); *Hotel & Restaurant Emps. Union, Local 703 v. Williams*, 752 F.2d 1476, 1479 (9th Cir. 1985) (citing *Aldrich Air Conditioning* with approval and recognizing that "[a]n arbitration panel cannot make [an interest arbitration clause in an expired contract] self-perpetuating by including an interest arbitration clause in the new contract"); *NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252*, 543 F.2d 1161 (5th Cir. 1976) (holding that interest arbitration clauses "are not enforceable to perpetuate inclusion of [interest] arbitration clauses continuously in contract after contract").

Here, it is undisputed that, as a result of interest arbitration, the NJAB awarded a successor agreement in 2017 which included an interest arbitration clause (Dkt. Nos. 23, at ¶ 21; 29-13, at 2; 30, at 5; 31, at ¶ 16). The successor agreement's inclusion of an interest arbitration clause is therefore unenforceable unless the Group consented to the clause's inclusion in the 2017 agreement. The Union argues that the NJAB's inclusion of interest arbitration in the successor

agreement in 2017 is enforceable because the Group consented to its inclusion (Dkt. No. 28, at 22). In support of its argument, the Union asserts that the Group never presented a proposal to change non-economic terms during the parties' negotiations up to and including June 6, 2017, and that the Group and the Union left the June 6, 2017, bargaining meeting agreeing to submit the Group's June 6, 2017, offer to the Union's membership for ratification (*Id.*). The Union further asserts that the NLRB's Advice Memorandum concluded that, if the membership had ratified the June 6, 2017, offer, the Union and the Group would have had a successor collective bargaining agreement with no substantive changes in non-economic terms and the agreed upon economic increases (*Id.*).

There is no evidence in the record before the Court establishing that the Group consented to inclusion of an interest arbitration clause in the 2017 agreement. According to the Union's notes of the May 5, 2017, negotiation between the Union and the Group, Mr. Zimmermann asked Mr. Hall and Mr. Simmons to review new language in the next agreement, and Mr. Hall agreed and said that he had noticed some wording that needed to be changed or updated (Dkt. No. 29-4). Further, according to the Union's notes of the June 6, 2017, meeting, Mr. Zimmermann passed out copies of the amended Union contract with new wording and told the Group that he would send a redlined copy to all employers and, at a meeting to be determined, review with the contractors for their approval (Dkt. No. 29-5). The June 6, 2017, notes also detail the Group's offer on wages, which Mr. Zimmermann told the contractors he would submit to Union membership to approve (*Id.*).

Thus, the Union's notes of May 5, 2017, and June 6, 2017, reflect that the parties intended to continue bargaining over the content of the successor agreement. The Union's notes of June 6, 2017, reflect that the Group made an offer as to wages only and did not make an offer of a final

agreement. Further, Union membership voted on July 7, 2017, and did not approve the Group's offer on wages (Dkt. No. 29-7). Accordingly, even if the Group had made an offer that included interest arbitration on June 6, 2017, the Union rejected that offer by its vote on July 7, 2017. Following the Union's rejection, the Group's offer terminated. *See* Restatement (Second) of Contracts § 38(1) ("An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention."). The Group was therefore free to withdraw at that time whatever consent to interest arbitration, if any, it may have previously given.

There is no evidence in the record before the Court establishing that the Group consented to inclusion of an interest arbitration clause following the Union's rejection of the Group's offer of June 6, 2017. According to the Union's notes of August 10, 2017, Mr. Zimmermann distributed the redlined copy of the contract proposal, and Mr. Sweere, who clarified that he was representing Bray, Edwards, and Harvey, distributed his own redlined copy of a proposal (*Id.*). Mr. Zimmermann and Mr. Sweere discussed the proposal, and Mr. Zimmermann declared deadlock and informed Mr. Sweere that the Union would be in contact (*Id.*, at 2). Mr. Sweere's proposal did not include Article X, Section 8, or any other interest arbitration clause (Dkt. No. 29-8, at 19). The Union's notes, therefore, do not establish that the Group consented to inclusion of an interest arbitration clause in a successor agreement. Rather, the notes indicate that, as of August 10, 2017, at least some members of the Group did not consent to inclusion of an interest arbitration clause. The record further indicates that, following the August 10, 2017, meeting, Bray, Edwards, and Harvey asserted that there was no agreement as to non-economic proposals and that they specifically objected to inclusion of Article X, Section 8 (Dkt. Nos. 29-10, at 6; 29-14, at 1). The Union has presented no record evidence that the Group consented to inclusion of an interest arbitration clause in the successor agreement in 2017.

Further, the Union's argument that the Group consented to interest arbitration on June 6, 2017, is logically inconsistent; the Court rejects this argument. On the one hand, the Union argues that the Group consented to interest arbitration because it presented an offer on June 6, 2017, that the Union maintains included interest arbitration, despite record evidence of the Group members' conflicting positions taken later including later before the NJAB. On the other hand, the Union argues that the Union consented to interest arbitration because it presented a contract proposal to the Group which included interest arbitration and because the Union later sought inclusion of an interest arbitration clause before the NJAB, despite Union membership on July 7, 2017, voting down the Group's June 6, 2017, proposal. The Union cannot have it both ways. Whatever offer the Group made on June 6, 2017, the offer does not imply that the Group consented to inclusion of an interest arbitration clause in a successor agreement any more than Union membership's voting down and rejecting the Group's offer implies that the Union did not consent to inclusion of an interest arbitration clause in a successor agreement. Instead, the undisputed record evidence is that the Group failed to present a consensus position before the NJAB; this undisputed record evidence is sufficient for this Court to conclude that the Group did not consent to inclusion of an interest arbitration clause in the successor agreement in 2017.

The Union also fails to make a compelling argument or present evidence that plaintiffs were bargaining individually and not on behalf of the Group when plaintiffs sought to remove the interest arbitration clause from the successor agreement. The Union presents no record evidence of the Group's internal structure, and no record evidence before the Court indicates the Group's structure, composition, or internal decision-making process. This Court, therefore, has no evidentiary basis on which to conclude that the Group consented to interest arbitration while plaintiffs engaged in individual bargaining. Tellingly, the Union neither argues nor provides

evidence that any members of the Group argued before the NJAB on September 11, 2017, that the Group consented to inclusion of an interest arbitration clause in a successor agreement. In the absence of any record evidence to the contrary, and in consideration of the record evidence before the Court, the Court concludes that the Group did not consent to inclusion of an interest arbitration clause in the 2017 successor agreement. Accordingly, the NJAB's inclusion through interest arbitration of an interest arbitration clause in the 2017 successor agreement renders the interest arbitration clause in the 2017 successor agreement void and unenforceable as against public policy.

The Union's citation to *Local Union 257, International Brotherhood of Electrical Workers v. Sebastian Electric*, 121 F.3d 1180 (8th Cir. 1997), is unpersuasive. In *Sebastian Electric*, employers executed letters of assent delegating their bargaining rights to a multiemployer association, and in 1992 the multiemployer association entered into a collective bargaining agreement with the union which included an interest arbitration clause. 121 F.3d at 1181–82. The employers timely withdrew from the multiemployer association prior to the expiration of the 1992 collective bargaining agreement. *Id.* The union pursued interest arbitration with the withdrawn employers pursuant to the 1992 collective bargaining agreement, and the arbitrator through interest arbitration awarded a successor agreement in 1994. *Id.* The union went to federal court to enforce the award of the 1994 agreement, and the employers argued that the award was unenforceable because they had timely withdrawn from the multiemployer association which negotiated the 1992 agreement with its attendant interest arbitration clause. *Id.* at 1183–84. The Eighth Circuit rejected the employers' argument because the employers had validly delegated their bargaining rights to the multiemployer association and because the interest arbitration clause in the 1992 agreement was enforceable. *Id.* at 1184.

Here, plaintiffs also delegated their bargaining authority to the Group in 2015 and 2017. The Union and the Group entered into an agreement which included an interest arbitration clause in 2015. The 2015 agreement validly allowed the Union to pursue interest arbitration in 2017, like the Eighth Circuit concluded the 1992 agreement in *Sebastian Electric* allowed the union to do in 1994. The critical distinction, though, is that the Group never made an agreement with the Union in 2017 which included interest arbitration. Rather, the NJAB imposed through interest arbitration the 2017 agreement which included an interest arbitration clause without the Group's consent. The Union may not now seek interest arbitration pursuant to the interest arbitration clause in the 2017 agreement because that clause is void as against public policy; the 2017 agreement resulted from an interest arbitration award which imposed an interest arbitration clause without the Group's consent. The *Sebastian Electric* court, in describing the facts of that case, specifically noted that in the 1994 arbitration award the parties were directed to sign and implement successive collective bargaining agreements for the period of March 1, 1994, to February 29, 1996, that did not contain interest arbitration clauses consistent with the holding in *Aldrich Air Conditioning*. 121 F.3d at 1182 n.5 (citing *Aldrich Air Conditioning*, 717 F.2d at 458–59). Accordingly, *Sebastian Electric* does not favor the Union's position in this case.

The Union further argues that this Court owes deference to the NJAB's decision (Dkt. No. 28, at 25). The Eighth Circuit has held, as the Union points out, that arbitration awards of collective bargaining agreements in general are entitled to "extreme judicial deference." *Sebastian Elec.*, 121 F.3d at 1184. However, the Eighth Circuit also recognized in the same paragraph that "while interest arbitration clauses generally are enforceable, the inclusion of an interest arbitration clause in the *successor* collective bargaining agreement will not be enforced because of the potential for collective bargaining agreements to become self-perpetuating[.]" *Id.* (citing *Aldrich Air*

*Conditioning*, 717 F.2d at 458–59). Accordingly, the Court does not owe extreme judicial deference to an arbitration award to the extent that the award includes an interest arbitration clause to which the parties did not agree in a successor collective bargaining agreement.

It is not clear whether the Union argues that this Court must also defer to the NLRB's Advice Memorandum, but the Union asserts that "[t]he Plaintiffs have offered no legitimate reason for the Court to conclude that the NLRB, as well as the NJAB, got it wrong." (Dkt. No. 28, at 21). To the extent that the Union argues that this Court owes any deference to the NLRB's Advice Memorandum, the Court rejects the Union's argument. Agency interpretations "contained in formats such as opinion letters are 'entitled to respect' under [the Supreme Court's] decision in *Skidmore v. Swift & Co.*, . . . but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The NLRB has clarified that advice memoranda from the NLRB General Counsel's Division of Advice "are intended to serve as internal instruction for use by the Office of the General Counsel, and have no precedential value or authoritative weight for administrative law judges." *U.S. Postal Serv.*, 345 NLRB 1203, 1214 n.17 (2005). Accordingly, the Advice Memorandum here has no power to persuade, and the Court need not defer to it.

Even if the Court owed any deference to the NJAB's decision, the NJAB's decision further establishes that the Group did not consent to the inclusion of interest arbitration in the successor 2017 agreement. The NJAB concluded:

> The parties are directed to execute a three-year agreement with the same terms and conditions as were tentatively agreed to by the Local Union and the multiemployer group on June 6, 2017 as reflected in the minutes of that meeting.
>
> In reaching the above-decision, it is the judgment of this Board that the multiemployer group had no clear spokesperson. With no procedures or past practice as to how to resolve their internal disputes, the employers appeared before this Board with conflicting positions. Having no means to resolve this conflict for the employers, the Board has looked for the most recent point in the negotiations

> when the multiemployer group held a cohesive position. The record reflects and the parties testified that the last consensus position held by the multiemployer group was the June 6, 2017 tentative agreement with the Local Union, which included Article X, Section 8.

(Dkt. No. 29-13, at 2). The NJAB therefore determined that members of the Group had no clear spokesperson, experienced internal disputes, and held conflicting positions. The NJAB imposed an interest arbitration clause, despite the employers' conflicting positions, based on the NJAB's finding that the Group held a consensus position on June 6, 2017, which included an interest arbitration clause. The NJAB did not find that the Group consented to inclusion of an interest arbitration clause, nor does the NJAB's decision or the record evidence before the Court now support such a finding.

### 2. Course Of Conduct

The Union further argues that the interest arbitration clause is enforceable because plaintiffs adopted the 2017 agreement through their course of conduct (Dkt. No. 28, at 26). According to the Union, the agreement awarded by the NJAB on September 11, 2017, is the only agreement between the parties, and that award includes interest arbitration (*Id.*). The Union thus argues that plaintiffs may not "unilaterally cherry pick out of the contract one objectionable term" (*Id.*). Plaintiffs argue that they have not challenged the NJAB's authority to impose a contract (Dkt. No. 34, at 22). Rather, plaintiffs argue that they challenge only the NJAB's inclusion of interest arbitration (*Id.*).

In fact, plaintiffs' course of conduct indicates, and the record demonstrates, that plaintiffs never adopted the interest arbitration clause in the 2017 agreement. Plaintiffs objected to inclusion of an interest arbitration clause in a successor agreement at the parties' meeting on August 10, 2017, prior to the NJAB hearing, and during the NJAB hearing. Following the NJAB decision, on September 18, 2017, Mr. Sweere sent an email to Joye Blanscett stating that Bray, Edwards, and

Harvey "hereby object to the decision of the NJAB as a whole and disagree with each and every finding in the DECISION," specifically the inclusion of Article X, Section 8 (Dkt. No. 29-14). Since then, plaintiffs have not pursued interest arbitration with respect to the 2017 agreement and have objected to the Union's attempts to pursue interest arbitration. The 2017 agreement also includes a clause which provides that "[i]f, pursuant to federal or state law, any provision of this Agreement shall be found by a court of competent jurisdiction to be void or unenforceable, all of the other provisions of this Agreement shall remain in full force and effect." (Dkt. No. 29-1, at 21). Accordingly, plaintiffs' course of conduct is consistent with this severability clause which provides that the rest of the 2017 agreement shall remain in full force and effect even if a provision of the 2017 agreement is found to be void.

Further, as explained above, this Court has an "absolute duty to determine whether an [arbitration] award violates public policy before enforcing it." *Trans States Airlines*, 638 F.3d at 578. Thus, even if plaintiffs adopted the entire 2017 agreement through their course of conduct, this Court would still have a duty to review the arbitration award and determine whether the award violates public policy before enforcing it.

V.    **Conclusion**

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment (Dkt. No. 21). The Court denies the Union's motion for summary judgment (Dkt. No. 27). The Court enters a declaratory judgment that the interest arbitration clause in the 2017 agreement imposed without the parties' consent by the NJAB at interest arbitration is void *ab initio* as against public policy.

It is so ordered this 26th day of May, 2021.

Kristine G. Baker
United States District Judge